IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| GREENBRIER LEASING CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | CV-04-1266-ST |
| | ) | |
| v. | ) | OPINION AND ORDER |
| | ) | |
| INTERMOUNTAIN COMMODITIES COMPANY, L.L.C. and BRYAN FORD, | ) ) ) | |
| Defendants. | ) | |

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Greenbrier Leasing Corporation ("Greenbrier"), commenced this action against defendants, Intermountain Commodities Company, L.L.C. ("Intermountain") and its President and owner, Bryan Ford ("Ford"), in the Circuit Court of the State of Oregon for the County of Multnomah, Case No. 0407-07266, to recover the amount due for breach of a lease of railroad cars. Pursuant to 28 USC § 1441, defendants timely filed a Notice of Removal with this court

based on diversity jurisdiction. The requirements of diversity jurisdiction under 28 USC § 1332 are met.

All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).

On March 18, 2005, Greenbrier filed its motion for summary judgment (docket # 19). Although Intermountain initially represented that it would file a cross-motion for summary judgment, it did not do so and instead contends that certain issues of fact require a trial. For the reasons that follow, Greenbrier's motion is granted in part and denied in part.

## **STANDARDS**

FRCP 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party does so, the non-moving party must go beyond the pleadings and designate specific facts showing a genuine issue for trial. *Id* at 324. The court does "not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City*, 180 F3d 1047, 1054 (9th Cir 1999). A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original, citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F2d 626, 631-32 (9th Cir 1987). The court must view the inferences drawn from the facts "in the light most favorable to the

nonmoving party." *Id* at 631 (citation omitted). Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id* at 630-31. However, when the non-moving party's claims are factually "*implausible*, that party must come forward with more persuasive evidence than would otherwise be [required] . . . ." *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F2d 1466, 1468 (9th Cir 1987), *cert denied*, 484 US 1006 (1988) (emphasis in original, citation omitted). "No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *Id*.

## **UNDISPUTED FACTS**

Intermountain failed to file a response to Greenbrier's Concise Statement of Facts as required by Local Rule 56.1(b). Pursuant to Rule 56.1(f), "material facts set forth in the concise statement of the moving party . . . will be deemed admitted unless specifically denied, or otherwise controverted by a separate concise statement of the opposing party." Intermountain has submitted an Affidavit of Bryan Ford ("Ford Affidavit") which controverts some of the facts submitted by Greenbrier. Thus, this court will deem Greenbrier's Concise Statement of Facts admitted except as expressly denied or controverted by the Ford Affidavit.

Pursuant to a Lease Agreement ("Lease") dated April 1, 2003, Greenbrier agreed to lease 50 railroad cars to Intermountain. Under a Guaranty Agreement ("Guaranty") also dated April 1, 2003, Ford personally guaranteed payment of all amounts due and owing to Greenbrier under the Lease.

Greenbrier delivered 49 cars to Intermountain over a period of time, although the delivery dates are not disclosed by the record. It appears that Intermountain had difficulty

nonmoving party." *Id* at 631 (citation omitted). Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id* at 630-31. However, when the non-moving party's claims are factually "*implausible*, that party must come forward with more persuasive evidence than would otherwise be [required] . . . ." *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F2d 1466, 1468 (9th Cir 1987), *cert denied*, 484 US 1006 (1988) (emphasis in original, citation omitted). "No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *Id*.

## **UNDISPUTED FACTS**

Intermountain failed to file a response to Greenbrier's Concise Statement of Facts as required by Local Rule 56.1(b). Pursuant to Rule 56.1(f), "material facts set forth in the concise statement of the moving party . . . will be deemed admitted unless specifically denied, or otherwise controverted by a separate concise statement of the opposing party." Intermountain has submitted an Affidavit of Bryan Ford ("Ford Affidavit") which controverts some of the facts submitted by Greenbrier. Thus, this court will deem Greenbrier's Concise Statement of Facts admitted except as expressly denied or controverted by the Ford Affidavit.

Pursuant to a Lease Agreement ("Lease") dated April 1, 2003, Greenbrier agreed to lease 50 railroad cars to Intermountain. Under a Guaranty Agreement ("Guaranty") also dated April 1, 2003, Ford personally guaranteed payment of all amounts due and owing to Greenbrier under the Lease.

Greenbrier delivered 49 cars to Intermountain over a period of time, although the delivery dates are not disclosed by the record. It appears that Intermountain had difficulty

meeting the payment schedule and missed the first lease payment due August 1, 2003. *See* Affidavit of Larry Stanley ("Stanley Affidavit"), Exhibit 5.

In the spring of 2004, Greenbrier allowed Intermountain to return 28 of the 49 cars ("returned cars") described in the Lease. Intermountain agreed to pay the rent due to Greenbrier for the returned cars through April 29, 2004 and Greenbrier, in return, agreed not to seek future rent from Intermountain for the returned cars. Greenbrier never delivered the 50th car.

Intermountain then failed to make the agreed upon payments. As a result, on June 15, 2004, Greenbrier declared Intermountain to be in default under the Lease and accelerated all payments due. As a result of Intermountain's default, Greenbrier repossessed the remaining 21 cars in the summer of 2004.

Subsequently, Greenbrier re-leased nine of the 21 cars ("re-leased cars") to another entity in early November 2004.

## DISCUSSION

### A. Breach of Lease (First Claim)

Greenbrier seeks summary judgment against Intermountain on its First Claim for breach of the Lease. Upon default by Intermountain, paragraph 13(B)(iii) of the Lease permits Greenbrier to:

> take possession of [the cars] and henceforth hold possess and enjoy the same free from any right of Lessee. Lessor shall, in addition have the right to recover from Lessee any and all unpaid rental and milage amounts and other past due amounts, plus the present value (using a six percent [6%] discount rate) of future lease rentals together with Lessor's costs and expenses, including reasonable attorney fees incurred in securing the enforcement hereof.

Thus, Greenbrier is entitled to recover past due rent, future rent, costs and expenses incurred as a result of Intermountain's default. The collection of these types of damages for breach of a lease is explicitly authorized by ORS 72A.5290(1)(a)(A) - (C):

> **(1)** After default by the lessee under the lease contract of the type described in ORS 72A.5230, or, if agreed after other default by the lessee, if the lessor complies with subsection (2) of this section, the lessor may recover from the lessee as damages:
>
> **(a)** For goods accepted by the lessee and not repossessed by or tendered to the lessor and for conforming goods lost or damaged within a commercially reasonable time after risk of loss passes to the lessee as provided in ORS 72A.2190:
>
> **(A)** *Accrued and unpaid rent* as of the date of entry of judgment in favor of the lessor;
>
> **(B)** The present value as of the same date of the *rent for the then remaining lease term* of the lease agreement; and
>
> **(C)** Any *incidental damages* allowed under ORS 72A.5300, *less expenses saved* in consequence of the lessee's default . . . .
> (emphasis added).

Accordingly, Greenbrier claims that pursuant to the terms of the Lease, Intermountain owes $636,775.41, plus interest on the principal amount at the rate of 7% per annum from February 18, 2005, until paid in full. This principal amount is comprised of back rent, future rent, and incidental costs associated with the default and repair of the returned and repossessed cars. Greenbrier does not seek rent for the nine re-leased cars after November 2004.

Intermountain disputes the amount owed Greenbrier. It contends by failing to deliver the 50th railroad car, Greenbrier is not entitled to recover future rent. Intermountain also contends that Greenbrier has failed to sufficiently mitigate damages by re-leasing the railroad cars; that the repair costs for the cars are inadequately documented; that the "switching" cost are

5 - OPINION AND ORDER

unreasonable; and that, generally, the amount of damages sought by Greenbrier are unreasonable in light of the actual harm suffered and therefore represent an unenforceable contractual penalty. Intermountain claims that it owes no more than $188,265.11 to Greenbrier for past due rent and repairs.

### A.    Future Rent

Greenbrier seeks future rent for 21 cars (49 minus the 28 returned cars) from June 1, 2004, through November 30, 2008, discounted at 6% to achieve a present value, less credit for the nine cars it was able to re-lease, plus 7.0% interest, for a total of approximately $308,253.77.

Although Intermountain admits that it failed to make payments specified by the Lease, it contends that Greenbrier did not comply with the Lease because it delivered only 49 of the 50 railroad cars. As a result, it argues that it has no obligation to pay any future rent for the returned and repossessed cars.

Intermountain's contention is based on paragraph 3 in Schedule No. 1 attached to the Lease which provides as follows:

> The Term of the Agreement with Respect to each Car described in this Schedule shall be sixty (60) months (the "Initial Term"). *The Initial Term shall commence (the "Commencement Date") on the first of the month following the date the last Car is delivered.* Lessee shall pay Interim Rent, as defined below, on Cars delivered prior to the Commencement Date equal to the daily equivalent of the Basic Rent ("Interim Rent"), payable monthly. Periods of less than a full calender month ("Month") shall be prorated based on a 30-day month. (emphasis added).

Because Greenbrier never delivered the 50th or "last" car, the 60 month Initial Term of the Lease never commenced. As a result, Intermountain take the position that it is liable only for payment of the Interim Rent of $600 per car per month as set forth in paragraph 6 in Schedule

No. 1 and not for any future rent payable upon the lessee's default as allowed by paragraph 13(B)(iii) of the Lease. In effect, until delivery of the 50th car, Intermountain interprets the Lease as being month-to-month and terminable at its discretion.

This court rejects Intermountain's interpretation of the Lease. According to the first paragraph of Schedule No. 1, the terms of the Lease are incorporated in their entirety. Intermountain's obligations under the Lease commenced on its effective date of April 1, 2003. According to paragraph 2, the Lease remained "in full force until it is terminated as to all of the Cars as provided herein," and the term of the Lease with respect to the cars listed on Schedule No. 1 "shall be as set forth on such Schedule." Paragraph 3 of the Lease further provides that "[e]ach Car shall be deemed delivered and subject to the terms and provisions of this Agreement on the date each Car is delivered to Lessee."

Typically in railroad car leasing, cars are delivered over time as they become available or are released from a prior lease, and delivery is subject to delays associated with railroad transportation over which the lessor has little control. Supplemental Affidavit of Larry Stanley, ¶ 4. Paragraph 3 of Schedule No. 1 relied on by Intermountain contemplates such staggered delivery dates. Staggered delivery dates result in accounting and tracking difficulties if a 60 month term is measured on a per car basis. Thus, commencing the "60 month term" on the first day of the month after the last car is delivered is a convenient way to compute the end of the lease term when Intermountain's payment obligations ceases. In other words, Intermountain owed Greenbrier $600 as Interim Rent per month for each car as it was delivered, plus $600 as Basic Rent all on 50 cars for 60 months starting with the delivery of the 50th car.

Intermountain is correct that according to paragraph 3 of Schedule No. 1, the Initial Term of the Lease did not commence because the 50th car was not delivered. However, Greenbrier was excused from delivery of the 50th car due to Intermountain's prior default by failing to pay the Interim Rent for the prior 49 cars.

According to paragraph 13(A)(I) of the Lease, a default includes the "nonpayment by Lessee of any sum required herein to be paid by Lessee when any such payment is due, and such nonpayment shall continue unremedied for a period of ten (10) days." By failing to pay the first rent payment due August 1, 2003, Intermountain was in default ten days later, entitling Greenbrier to the remedies allowed by paragraph 13(B) of the Lease.

A material breach by one party to a contract discharges the remaining duties of the other party. *Wasserburger v. Amer. Sci. Chem.*, 267 Or 77, 82, 514 P2d 1097, 1099 (1973). After Intermountain defaulted, Greenbrier allowed Intermountain to return 28 of the 49 cars delivered. As part of this concession, Greenbrier agreed to waive future rent payments for the returned cars, and Intermountain agreed to make payments for rents owed through April 29, 2004 (effectively waiving any claim to the delivery of the 50th car by limiting its obligation to only the first 21 cars). On June 15, 2004, Greenbrier declared Intermountain to be in default because of failure to make the agreed upon payments and accelerated payments due under the Lease.

In light of these events, Greenbrier's non-delivery of the 50th car is not a breach of the Lease, but was excused in light of Intermountain's prior failure to make payments when due. In response to a breach of contract, the injured party may suspend its performance and terminate the contract. *Northwest Lumber Sales, Inc. v. Continental Forest Products, Inc.*, 261 Or 480, 491, 465 P2d 744, 750 (1972). Indeed, suspending performance is exactly what Greenbrier did by

stopping delivery of the 50th car. Greenbrier did not terminate the Lease at that time, but apparently allowed Intermountain a right to cure the default by paying within a reasonable time. Accordingly, Greenbrier's non-delivery of the 50th car was justified.

Intermountain also argues that its interpretation of the Lease comports with ORS 72A.5050(2) which states that "[upon] termination of the lease contract, all obligations that are still executory on both sides are discharged but any right based on prior default or performance survives." Intermountain's reliance on ORS 72A.5050(2) is misplaced because the statute specifically provides that "any right based on prior default or performance survives." Here, the rights Greenbrier seeks to enforce are those set forth in paragraph 13(B) of the Lease as a result of Intermountain's default, which include the right to recover "the present value of future lease rentals." Greenbrier's right to "future lease rentals" is a "right based on prior default." As a result, Greenbrier's rights survive the termination of the Lease under the plain language of ORS 72A.5050(2).

In sum, the mere fact that the 50th car was not delivered as a result of Intermountain's default under the Lease does not prohibit Greenbrier from recovering its remedies set forth in paragraph 13(B) of the Lease. Intermountain's contention may have had merit if it had never agreed to a staggered delivery of cars or if the delays in delivery were otherwise unreasonable. *See Walton v. Denhart*, 226 Or 254, 260-261, 359 P2d 890, 893 (1961) (a contracting party's failure to timely perform is not a material breach in the absence of contract language requiring it); *see also Spiess v. White*, 172 Or App 36, 40-41, 17 P3d 568, 571 (2001) (a time-of-the-essence clause may be reinstated by notice or conduct). However, the record contains no such evidence.

Intermountain's theory that the non-delivery of 50th car bars Greenbrier from recovering future rent under paragraph 13(B)(iii) is not supported by the language of the Lease and the evidence. To the contrary, the facts reveal that Intermountain breached the lease by defaulting on payments and therefore is liable to Greenbrier for all damages allowed by paragraph 13(B)(iii), including the "present value of future lease rentals." These future lease rentals include all rent which the parties expected to accrue from the date the 49th car was delivered and continuing for 60 months for the 21 cars at issue.

B. **Failure to Mitigate**

Intermountain claims that Greenbrier has failed to adequately mitigate its damages, citing *Enco, Inc. v. F.C. Russell Co.,* 210 Or 324, 339, 311 P2d 737, 744-45 (1957), (an injured party must exercise "reasonable care and business prudence . . . to minimize [its] loss."). Normally, the defendant bears the burden of proving this defense. *Id*. In contrast, a reasonable effort to mitigate damages is a duty imposed on the lessor of real property:

> In ordinary circumstances property which is the subject matter of a contract to execute or renew a lease can be leased to others upon the promissor's failure to accept the lease. Under such circumstances it is reasonable to assume, in the absence of proof to the contrary, that the lessor's loss is not the full amount of the stipulated rent but an amount which represents the difference between the stipulated rent and the rent which plaintiff would receive upon leasing the premises to others. If the plaintiff can show that there is no market for the leasehold, he can, of course, recover the entire amount of the rent reserved, but it is his burden to show this and if he does not, he has not made out his case.

*Kulm v. Coast-to-Coast Stores Central Org., Inc.,* 248 Or 436, 442, 432 P2d 1006, 1009 (1967).

However, it is unclear whether a duty to mitigate against the loss of future rent arises in this case involving a lease of goods. While the parties appear to agree that Greenbrier has a

duty to mitigate, that duty may not apply to the liquidation of damages set forth under the terms of this lease. Liquidation of damages for leased goods is governed by ORS 72A.5040, which explicitly states that the "present value of future rentals" are "reasonable." While a duty to mitigate might arise for a party seeking damages based on an expectancy theory of recovery, to the contrary, given the plain language of the statute, the present value of future rents may be reasonable *per se* as liquidated damages when the parties agree to the term in advance. If this is indeed the intent of Oregon's legislature, then the applicability of *Enco*, *Kulm*, and other cases elucidating a common law duty to mitigate is dubious. Because this is purely a question of law, this uncertainty will need to be resolved in advance of trial based on additional briefing by the parties.

Assuming that Greenbrier has a duty to mitigate, Intermountain argues that Greenbrier's inability to re-lease more than nine of the 21 cars was not commercially reasonable. The evidence in the record supporting this defense is the following statement by Ford:

> I disagree with Greenbrier's claim that it has made reasonable efforts to re-lease the railroad cars in its possession. I have been involved in the railroad business since 2001. Since that time, and although I am not in the business of subleasing my railroad cars, I have been contacted on numerous occasions to sublease my railroad cars. In fact, since the summer of 2004, I have been contacted at least a half-dozen times by persons or entities interested in subleasing railroad cars in my possession. Based on my experience, the fact that Greenbrier still has 12 railroad cars not re-leased after almost 9 months in its possession shows that Greenbrier is not making reasonable efforts to re-lease the railroad cars.

Ford Affidavit, ¶ 16.

While this evidence is certainly sparse, Ford's statement is adequate to create a question of material fact in support of a failure-to-mitigate defense. Ford's assertion is rebutted only by Greenbrier's equally conclusory assertion that it has made reasonable efforts to release the cars and the fact that it has succeeded in re-leasing nine of 21 cars. Greenbrier has presented no evidence characterizing the market and demand for re-lease of railcars, or any other evidence that would objectively demonstrate to the court that re-leasing only nine of 21 cars is commercially reasonable. Furthermore, it appears that Intermountain's effort to obtain discovery on this point has not met with full cooperation, a circumstance which makes the use of summary judgment inappropriate in regard to the mitigation defense. Accordingly, the question of whether Greenbrier's efforts to mitigate are reasonable remains unresolved.

### C. Offset

Intermountain also contends that it is entitled to an offset in damages for revenues earned by Greenbrier from use of the repossessed cars. Greenbrier does not dispute this contention and includes in its damages calculation the sum of $20,632.70 as a "Credit for Collected and Held Car Hire through January 31, 2005." Stanley Affidavit, Exhibit 5. Intermountain contends that its attorney was previously advised that Greenbrier had in its possession the sum of $20,780.62 for car hire earnings. Ford Affidavit, ¶ 15. Although this is only a slight discrepancy, it is sufficient to create an issue of fact concerning the correct amount of offset due.

Further, as Greenbrier concedes, any car hire earnings received by Greenbrier through the 60 month term of the Lease must be credited against any outstanding judgment against Intermountain, or, in the event that such a judgment has been satisfied, delivered to Intermountain.

12 - OPINION AND ORDER

///

D. **Repair Costs**

Greenbrier also seeks costs which it incurred to repair damages to the car doors and interiors. According to paragraph 5 of Schedule No. 1, Intermountain is responsible for all door and car interior maintenance. In addition, paragraph 13(B)(iii) of the Lease provides that, in the event of default, Greenbrier shall have the right to recover "costs and expenses" resulting from default.

Intermountain concedes that it owes $605.11 for repair work and disputes the rest of Greenbrier's claim for repair costs. First, Intermountain contends that the repair costs sought by Greenbrier are not adequately supported by evidence in the record. In response, Greenbrier submitted supporting documentation with its Reply, rendering this contention moot. However, prior to receiving the Reply, Intermountain did not receive information from Greenbrier through discovery clearly setting forth in detail the alleged damages to the cars and subsequent repair costs allegedly incurred by Greenbrier. Ford Affidavit, ¶ 10. As a result, it has not yet had an opportunity to test the accuracy of Greenbrier's claim and calculations.

Intermountain also claims that neither the doors nor the car interiors needed repair, offering as proof a statement made in the spring of 2004 to Ford by an unidentified business associate who allegedly stated that the cars "were in good condition and not in need of repair to either the doors or the interiors." *Id.* Because the competitor remains unidentified and offers no affidavit of his own, this statement is purely hearsay and inadmissible. However, it supports a need for Intermountain to have an opportunity to review and possibly contest the amount of Greenbrier's claim for repair costs. Accordingly, this issue cannot be resolved at this juncture.

13 - OPINION AND ORDER

### E. Movement and Switching Charges

Greenbrier also seeks to recover movement and switching charges which are the costs of moving and re-marking each car's roadmark and number. Intermountain claims that Greenbrier is not entitled to recover any switching costs. Paragraph 14(D) of the Lease requires that "re-marking shall be performed at a facility mutually agreed to" by the parties and Intermountain was never consulted about the choice of facility.

This argument fails because paragraph 14(D) applies only when the Lease has expired or is terminated in accordance with any right of early termination. It does not apply in the event of default which is governed by paragraph 13 which allows Greenbrier to recover all costs incurred in the repossession and re-letting of cars.

Intermountain also contends that Greenbrier has failed to submit supporting documentation in support of its claim for movement and switching charges. Greenbrier also submitted that supporting documentation with its Reply. However, as noted above, Intermountain has not yet been provided an opportunity to review and possibly contest the amount of Greenbrier's claim for these charges.

### F. Reasonableness of Damages When Viewed as a Penalty

Intermountain argues that the damages sought by Greenbrier are unreasonable in light of the actual harm suffered or harm anticipated in advance of Intermountain's breach. An unreasonably large agreed upon amount of damages is unenforceable. ORS 72.7180(1). Agreed upon damages are reasonable where congruent with the actual harm suffered by the non-breaching party. *See Illingworth v. Bushong*, 297 Or 675, 692-93, 688 P2d 379, 389-90 (1984).

The damages specified by the Lease are not a static liquidated damages amount. Instead, the Lease anticipates and identifies distinct categories of economic harm that Greenbrier would incur in the event of a breach and obligates Intermountain to pay the cost of the resulting harm. Because the Lease does not fix these costs in advance, it cannot be said that the remedies Greenbrier seeks are unreasonable in light of the actual harm. To the contrary, the damages sought *are* the actual harm as calculated and accounted for in light of the actual losses suffered in the manner anticipated by the lease. Oregon law specifically approves of the kind of damages sought:

> A provision in the lease agreement which states that damages in the event of the lessee's default and the lessor's sale of the goods include, in addition to costs payable to third parties, any *past due amounts* plus the sum of the *present value of future rentals*, the *lessor's costs of enforcing the lease*, the lessor's reasonably predictable residual at expiration, reasonable compensation for any loss of tax benefits, or an equivalent amount, and any *other damages suffered or* to be suffered by the lessor because of the lessee's default, less the net proceeds of sale, *is reasonable*.

ORS 72A.5040 (emphasis added).

Intermountain's argument is therefore misplaced and without merit.

## II. Breach of Guaranty (Second Claim)

Greenbrier also seeks summary judgment against Ford under the Guaranty Agreement. Citing *W.J. Seufert Land Co. v. Greenfield,* 262 Or 83, 92, 496 P2d 197, 201-02 (1972), Greenbrier argues that Ford is not entitled to any of the defenses pled by Intermountain because the Guaranty contains a sweeping waiver of defenses ("[w]ith full knowledge of its significance and consequence, Guarantor waives . . . any disability or defense of Lessee . . .").

The defenses raised by Intermountain relate to what damages are owing, not whether they are collectable. *W.J. Seufert* and other cases cited by Greenbrier deal with barriers to the collection of otherwise valid debts, such as bankruptcy statutes, and hold that these types of protections can be validly waived by guarantors where the effect does not contravene public policy. The principle appears to be inapplicable here because the parties dispute what amount owed, not whether a valid debt is otherwise uncollectible. Ford has indeed waived any defenses that would serve to insulate him from damages resulting from the breached Lease, but he has not waived the right to argue about the rightful amount of damages.

## ORDER

For the reasons set forth above, Greenbrier's Motion for Summary Judgment (docket # 19) is GRANTED in part and DENIED in part. Intermountain breached the Lease with Greenbrier and, therefore, consistent with the terms of the Lease and Oregon law, Intermountain and Ford owe Greenbrier past due rent, unpaid future rent, repair and switching costs, attorney's fees and all other costs authorized by paragraph 13(B) of the Lease. However, the amount due and owing to Greenbrier remains in dispute.

The court will set a telephone conference with the parties to discuss the case status and schedule.

DATED this 3rd day of June, 2005.

                                              /s/ Janice M. Stewart
                                              Janice M. Stewart
                                              United States Magistrate Judge